## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nathaniel J. Arnold, being duly sworn, state as follows:

### Introduction and Agent Background

1.      I am a Border Patrol Agent (BPA) of the United States Border Patrol (USBP), a component of Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been so employed since August 11, 2008. I have been assigned to the Richford, Vermont Station (a station within Swanton Sector) as a BPA for approximately 6 years and currently serve as the station's Prosecutions Agent. I was previously assigned to the Yuma, Arizona Border Patrol Station as a BPA for approximately 10 years.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of four electronic devices — further described below and in Attachment A — that are currently in the possession of the USBP and the seizure from these devices of the electronically stored information described in Attachment B. This warrant application arises from the USBP's contact with Hassan Kabir ("KABIR"), a United States citizen, Bikramjat Singh ("SINGH"), a citizen of India, and Sohan Lal ("LAL"), a citizen of India, on September 17, 2024 in the District of Vermont. As a result of this contact, a federal investigation commenced concerning KABIR, SINGH, and others, who are or may be involved with bringing aliens to the United States at a place other than a designated port of entry, transportation of aliens in furtherance of their illegal entry, and conspiracy and aiding and abetting these crimes, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), and/or 1324(a)(1)(A)(v)(II).

3.      The devices to be searched include a silver Apple iPhone (hereinafter the "KABIR SILVER DEVICE") and a blue cell phone (hereinafter the "KABIR BLUE DEVICE"). Both of

1

these devices were seized from the person of KABIR on September 17, 2024. Additionally, the devices to be searched include a white Apple iPhone (hereinafter the "SINGH DEVICE"), seized from the person of SINGH on September 17, 2024; and a blue Realme cell phone (hereinafter the "LAL DEVICE") seized from the person of LAL on September 17, 2024.  The KABIR SILVER DEVICE, the KABIR BLUE DEVICE, the SINGH DEVICE and the LAL DEVICE (collectively, "the DEVICES"), are currently in evidence storage at the Richford Border Patrol Station, which is located at 1668 St. Albans Road in Richford, Vermont.

4.     Based on my training and experience, the DEVICES have been stored in a manner such that the data on them will have remained intact and in the same condition as they were at the time of the DEVICES' seizure. The applied-for warrant would authorize the forensic examination of the DEVICES for the purpose of seizing electronically stored data, particularly described in Attachment B, that would evidence the aforementioned federal offenses of human smuggling and illegal entry that the users of the DEVICES engaged in or aided and abetted.

5.     In my experience investigating many human-smuggling cases, I have found that electronic devices such as cellular phones – and, thus, the DEVICES – are commonly used to facilitate smuggling events in multiple ways.  For example, participants use cellular phones to coordinate transportation in advance of the event and to guide migrants during the event across the border and to the waiting vehicle. In addition, smugglers utilize cellular phones to discuss and receive proof of payment from those being smuggled. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The DEVICES may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos.

2

Further, individuals who commit these types of crimes together or who know about crimes committed by their close associates may communicate about those crimes through electronic communications that would be stored on a cellular telephone. The communications would be similar to those previously noted. Further information stored in the memories of these DEVICES could constitute evidence of criminal activity. The DEVICES may also contain GPS or similar location information indicating where the DEVICES have traveled. With their cellular phones, those involved in illegal transportation activity often take photographs or videos of their illegal activities including maps, associates, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of those cellular phones. Moreover, coordinators often track the migrants' and drivers' positions in real time during a smuggling event, and they exchange verbal and/or non-verbal communications over Wi-Fi and/or cellular networks to help them locate one another. These tasks are frequently necessary in northern Vermont generally, and the Richford Station Area of Responsibility (AOR) specifically, because the remote and rural nature of the AOR makes it difficult to arrange meetings at precise times and to navigate to locations unlikely to appear on printed maps.

6.     The information contained within this affidavit is based upon my training and experience, my own investigative efforts, and investigation by other law enforcement officers with whom I have spoken or whose reports I have reviewed. The following is either known to me personally or has been related to me by persons having direct knowledge of the events described below. The information in this affidavit is meant to set forth probable cause to believe that the violations occurred and that evidence of them will be found on the DEVICES; it does not necessarily include every fact known to law enforcement about the events described below.

Unless otherwise specified, the statements described in the following paragraphs are related in sum and substance and are not meant to be direct quotations or complete descriptions.

<b>Probable Cause</b>

7.      On September 17, 2024, BPA William Haffly was patrolling in his marked service vehicle in Enosburg, Vermont. At approximately 8:00 p.m., BPA Haffly observed a black sedan driving eastbound on VT-105 near Water Tower Road.  As the vehicle passed BPA Haffly's location, BPA Haffly noted there was only one visible subject (the driver) in the vehicle.  BPA Haffly also noted the vehicle had a distinctive taillight, license plate frame, and out-of-state plates. While VT-105 is predominantly an east-west road, the portion of VT-105 east of Enosburg is primarily northbound and goes through Richford, Vermont to Jay, Vermont, parallels the international boundary between the United States and Canada, and at times is within a half mile from the international boundary.

8.      At approximately 10:25 p.m., BPA Haffly saw the same vehicle driving westbound towards Enosburg on VT-105 near Choquette Road in Berkshire, Vermont.  BPA Haffly recognized the vehicle due to the same distinctive taillight and license plate frame, but this time observed the driver and multiple subjects in the vehicle in both the front and back seats.

9.      BPA Haffly followed the vehicle and was able to read the vehicle license plate to be Pennsylvania "MFH2128."  BPA Haffly requested a registration check on the vehicle through Swanton Sector Radio Dispatch ("DISPATCH") using his service radio and soon afterward activated his emergency equipment to initiate a vehicle stop. The vehicle soon yielded.  BPA Haffly approached the vehicle and identified himself as a Border Patrol Agent.  BPA Haffly confirmed that the driver, Hassan KABIR, was the registered owner.  BPA Haffly noticed a cell

4

phone mounted on the dashboard of the vehicle (the KABIR BLUE DEVICE) with a mapping application open.

10.     BPA Haffly looked through the vehicle windows and saw that there were four additional passengers who had dirty and wet clothing and were each holding a backpack. BPA Haffly knew from his experience that people who illegally enter the United States often walk through tall vegetation that leaves their clothes dirty and wet, and that that was particularly common at that time of year. BPA Haffly also knew from experience that people who illegally enter the United States often bring a backpack with them to carry their belongings during their illegal entry.

11.     While speaking with BPA Haffly, KABIR stated he was an Uber driver and had just picked up the subjects. This statement was suspicious, as the location of the vehicle stop was in northern Vermont, an approximately 7.5-hour drive from KABIR's residence in Lansdale, Pennsylvania. BPA Haffly noted that while KABIR was cooperative, he seemed flustered and excited throughout the conversation.

12.     BPA Haffly then spoke to the passengers in the vehicle. One passenger spoke English and admitted that he and the other subjects in the vehicle were citizens of India and had illegally entered the United States from Canada. None of the subjects had immigration documents permitting them to enter or remain in the United States.

13.     During the vehicle stop, KABIR was in possession of a second cell phone device (the KABIR SILVER DEVICE). BPA Haffly found this device in a search of KABIR's person subsequent to his arrest.

14.     All four Indian citizens were found to have a cell phone in their pants pockets. These phones included the SINGH DEVICE, found on the person of SINGH, and the LAL DEVICE, found on the person of LAL.

15.     The four Indian citizens were detained for being illegally present in the United States and were transported to the Richford Border Patrol Station for processing. KABIR was also detained and transported to the Richford Border Patrol Station for further investigation.

16.     At the Richford Border Patrol Station, agents took the fingerprints and biographic information of the four Indian citizens and entered them into the E3 Nextgen fingerprint database. This database would have contained records of any valid admission documents or applications therefor as to these persons. The database returned no match for the subjects having any valid admission documents or for applications to enter or remain in the United States.

17.     KABIR's fingerprints and biographic information were also entered into the E3 Nextgen fingerprint database. KABIR entered the United States in 2001 on a valid V-2 Visa. KABIR has since applied for and been granted U.S. citizenship.  No criminal history for KABIR was discovered.

18.     At the Richford Station, KABIR was read his *Miranda* rights by BPA William Haffly. KABIR agreed to give a statement without an attorney present and gave consent to a search of his cellular device. The interview was conducted in the English language.

- KABIR admitted to being paid to drive from Pennsylvania to Vermont to pick up people and transport them to Richmond, NY.

- KABIR claimed he was to be paid $2,000 once he picked them up and transported them to Richmond.

- KABIR stated that he had made one previous trip, on September 14, 2024, and received $2,000 USD via Zelle for this transportation.

19.     During the two dates KABIR stated he picked up subjects near the international boundary, the vehicle that was registered to KABIR was recorded on License Plate Readers (LPRs) at the following times, at the following locations, indicating he was headed north at the time:

1) September 14, 2024

- 2:01 P.M., I-87, New Windsor, NY

- 2:39 P.M., I-87, Saugerties, NY

- 3:24 P.M., I-87 Clifton Park, NY

- 4:14 P.M., I-87, Queensbury, NY

2) September 17, 2024

- 3:58 P.M., I-87 New Windsor, NY

- 4:46 P.M., I-87, Saugerties, NY

- 5:36 P.M., I-87 Clifton Park, NY

- 6:05 P.M., I-87, Queensbury, NY

20.     At the Richford Station, BPA William Haffly interviewed the Indian citizens that were passengers in the vehicle. The subjects were read their *Miranda* rights and agreed to be interviewed without an attorney present.

21.     During his interview, Sohan LAL stated he knowingly, illegally entered the United States with the intention of living in New York.

22.     In my experience as a Border Patrol Agent, migrants illegally entering the United States oftentimes communicate with the facilitators of the illicit entry and subsequent travel. In

the last month, the Border Patrol has detected multiple illegal cross-border events involving Indian citizens entering near North Jay Road. Due to the recent, organized traffic on North Jay Road, it is likely that LAL has communications on his phone with people of interest who arranged his illegal entry into the United States.

23.     During an interview, a separate subject stated the group was guided in by Bikramjat SINGH from Canada to the location at which the group was picked up. The subject stated SINGH was communicating with people using his cell phone as the group walked through the woods.

24.     BPA Haffly read Bikramjat SINGH his *Miranda* rights, but SINGH did not wish to make a statement without a lawyer present.

25.     Bikramjat SINGH was the only subject who was not in possession of his passport or any other identification when he illegally crossed into the United States. The possessions in SINGH's backpack were minimal: little more than a change of clothes and a cell phone charger. In my experience as a Border Patrol Agent, foot guides often carry fewer items with them during their illegal entry, because their time in the United States is expected to be short. Further, in my experience as a Border Patrol Agent, subjects illegally entering the United States oftentimes bring identification with them to establish their identity once in the United States, whereas foot guides have no intention of establishing, (or have already established) their identity in the United States.

### Information Regarding Electronic Storage and Forensic Analysis

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, records of content that has been viewed

8

via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

        a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

        b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

        c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how

9

a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    28.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## Conclusion and Request

    29.   Based on the foregoing, I submit there is probable cause to believe that from at least September 14, 2024, through the time of his arrest, Hassan KABIR transported aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who had illegally entered the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), and/or 1324(a)(1)(A)(v)(II). Further, there is probable cause to believe that evidence of these violations will be located among the data on the KABIR DEVICES. I respectfully request the issuance of a search warrant authorizing the examination of the DEVICES, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

    30.   Based on the foregoing, I submit there is probable cause to believe that on September 17, 2024, at the time of his arrest, Bikramjat SINGH brought aliens to the United

10

States at a place other than a designated port of entry, and conspired to transport aliens in furtherance of their illegal entry while knowing or recklessly disregarding the fact that they were aliens who had illegally entered the United States, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(i), 1324(a)(1)(A)(ii), 1324(a)(1)(A)(v)(I), and/or 1324(a)(1)(A)(v)(II). Further, there is probable cause to believe that evidence of these violations will be located among the data on the SINGH DEVICE. I respectfully request the issuance of a search warrant authorizing the examination of the SINGH DEVICE, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

31.    Based on the foregoing, I submit there is probable cause to believe that on September 17, 2024, LAL illegally entered the United States in violation of 8 U.S.C. § 1325 Further, there is probable cause to believe that evidence will be located among the data on the LAL DEVICE related to communications with others who assisted him in his illegal entry, both by bringing LAL to a place other than a designated port of entry (in violation of 8 U.S.C. § 1324(a)(1)(A)(i)) and transporting him after his entry (in violation of 8 U.S.C. § 1324(a)(1)(A)(ii)). I respectfully request the issuance of a search warrant authorizing the examination of the DEVICE, further described in Attachment A, and the seizure therefrom of the data described in Attachment B.

32.    Because this warrant seeks only permission to examine the DEVICES, which are already in law enforcement's possession, the execution of this warrant would not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this _26_ day of September, 2024.

11

NATHANIEL J. ARNOLD
Border Patrol Agent
U.S. Border Patrol

Sworn and subscribed before me on this _26_ day of September, 2024.

HON. JUDITH G. DEIN, Magistrate Judge
United States District Court

12